USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/15/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
KAI SHAUN BENITEZ,                          :
                                            :          **OPINION AND ORDER**
                    Plaintiff,              :
                                            :
          -against-                         :          23-CV-07087  (KHP)
                                            :
Commissioner of Social Security,            :
                                            :
                    Defendant.              :
------------------------------------------------------------X

**THE HONORABLE KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Kai Shaun Benitez ("Mr. Benitez" or "Plaintiff"), represented by counsel, commenced this action against Defendant, Commissioner of the Social Security Administration (the "Commissioner"), pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g.) Plaintiff seeks judicial review of the final determination of Defendant that Plaintiff was not disabled as of September 16, 2016, the onset date of his alleged disability ("AOD"), and therefore not entitled to Social Security Disability ("SSD") benefits on that date. Plaintiff has moved for judgment on the pleadings. For the reasons set forth below, the Court DENIES Plaintiff's motion, and AFFIRMS the decision of the Commissioner.

**BACKGROUND**

Plaintiff, who was born in 1993, is 30 years old and was 23 years old at the onset of his alleged disability. ECF No. 9 at 2. Plaintiff has been married since about 2018. (Administrative Record ("A.R."), ECF No. 8 at 60.) Plaintiff has a high school education. (ECF No. 9 at 2.) Plaintiff's relevant past work includes work as a companion, a direct driver, a retail cashier, a counter attendant, a kennel attendant, and a warehouse worker. (A.R. 23, 238.) Plaintiff's

1

relevant impairments are bipolar disorder, anxiety, depression, and **attention deficit hyperactivity disorder** ("ADHD".)  (A.R. 18.)  Plaintiff also has substance use disorder, asthma, and gender identity disorder, which are nonsevere and did not prevent Plaintiff from working previously.  (A.R. at 18-19.)

On July 2, 2020, Plaintiff filed an application for SSD benefits.  (ECF No. 9 at 2.) The Social Security Administration denied Plaintiff's applications initially and upon reconsideration.  (A.R. 87; 96-97.)   Plaintiff then requested a hearing before an ALJ on July 21, 2021.  (A.R. 140-142.) ALJ Angela Banks held a hearing on February 7, 2022.  (A.R. 41-56.)  The ALJ issued an unfavorable decision on May 3, 2022.  (A.R. 104-13.)  Plaintiff requested review by the Appeals Council, A.R. at 200-03, and on June 6, 2023, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (A.R. 1-4.)  This action followed.

### 1. Relevant Medical Evidence

### A. Callen-Lorde

Mr. Benitez has been a patient at Callen-Lorde Community Health Center since at least December 2015.  (A.R. 448.)  Initially, in a December 18, 2015 appointment with Susan Weiss, FNP, Mr. Benitez reported insomnia, generalized weakness, and malaise.  *Id.*  The primary purpose of the appointment was for Mr. Benitez to begin gender-affirming care.  *Id.*  On February 1, 2018, Mr. Benitez was again seen by Ms. Weiss to begin his transition.  (A.R. at 446.)  Ms. Weiss noted no abnormalities on physical exam, including a normal psychiatric orientation, with appropriate mood and affect.  *Id.*  On February 27, 2018, Mr. Benitez was seen

by Akash Patel, D.O., who noted Mr. Benetiz's history of post-traumatic stress disorder ("PTSD")

with anger and rage.  (A.R. 442.)  Dr. Patel noted Mr. Benetiz had "normal" memory, as well as

a normal psychiatric orientation to time, place, and situation with normal judgment and

appropriate mood and affect.  (A.R. 443.)

Mr. Benetiz was again seen by Dr. Patel on March 13, 2018, who provided gender-

affirming care and again noted that Mr. Benitez had a normal orientation to time and place,

with an appropriate mood, and normal judgment and insight.  (A.R. 438.)  Similar psychiatric

results were noted in visits for gender-affirming care at Callen-Lorde on March 27, 2018 (A.R.

434), April 10, 2018 (A.R. 431), April 25, 2018 (A.R. 425), May 08, 2018 (A.R. 422), May 24, 2018

(A.R. 420), and June 7, 2018.  (A.R. 417.)  On June 12, 2018, Dr. Patel noted that Mr. Benitez

reported a history of PTSD, generalized anxiety disorder ("GAD"), and was concerned about

mood swings.  (A.R. 412.) The physical exam noted normal memory, "grossly intact" cranial

nerves, as well as a normal orientation to time and place with appropriate mood and normal

judgment. (A.R. 413.)  On June 21, 2018, Dr. Patel noted that Mr. Benitez raised "no

complaints," along with the normal psychiatric findings. (A.R. 409-10.) Similar results were

reported for visits for gender-affirming care on June 24, 2018 (A.R. 405-406.)  On September 13,

2018, Mr. Benitez completed a patient health questionnaire ("PHQ") wherein he was asked

how often he was bothered by either "little interest or pleasure in doing things" or "feeling

down, depressed, or hopeless" and he indicated "not at all." (A.R. 400.)  On October 25, 2018,

Mr. Benitez reported episodes of "phantom emotions," and Dr. Patel noted normal neurological

and psychiatric presentation.  (A.R. 397-398.)

Starting in or around July 25, 2019, Mr. Benitez was seen by Ramazan Bahar, NP.  (A.R. 391.)  On July 25, 2019, Mr. Bahar noted Mr. Benitez's normal psychiatric and neurological symptoms.  (A.R. 390.)  Mr. Benitez completed another PHQ where he indicated being bothered by feeling down, depressed, or hopeless, nearly every day.  (A.R. 386.)  Based on the results of the PHQ, Mr. Bahar recommended further testing.  *Id.*  On August 26, 2019, Mr. Benitez returned and completed another PHQ, and indicated that over the previous two weeks he had "not at all" been bothered by feelings of feeling down, depressed, or hopeless.  (A.R. 382.)

On October 4, 2019, Mr. Benitez was seen for psychotherapy with Katherine Taveras, L.C.S.W.  (A.R. 482.)  He reported anxiety, mood disturbances, irritability, high distractibility, difficulty focusing, sleep and mood disturbances.  *Id.* Mr. Benitez reported a prior history of mental health treatment with inconsistent compliance with Vyvanse and Adderall prescriptions. *Id.* He denied any illicit drug use or self-injurious behaviors.  *Id.* During the mental status examination, Plaintiff reported an anxious mood with mood changes/disturbances, and high distractibility.  (A.R. 482-483.)  Ms. Taveras observed preoccupations and ruminations in thought content, roughly average intelligence, normal insight, normal judgment, and a logical thought process.  *Id.*  Ms. Taveras diagnosed Mr. Benitez with an unspecified mood disorder.  (A.R. 483.)  The following week on October 10, 2019, Mr. Benitez described relationship stressors.  (A.R. 480.)  No changes were noted on mental status exam.  *Id.*

On October 14, 2019, Mr. Benitez was seen by Jan Vincent Samson, P.M.H.N.P.-B.C., for a psychiatric diagnostic evaluation with medical services.  (A.R. 486.)   Mr. Benitez reported seeking care because of severe anxiety, depression, and relationship issues.  *Id*.  Mr. Samson

noted that Mr. Benitez reported a history of depression and anxiety, "feeling sad all the time," isolation, agitation, poor sleep, poor appetite. *Id.* Mr. Samson diagnosed mood disorder. (A.R. 489.) He prescribed Lamictal, which is prescribed to treat abnormal moods, depression, and mania. (A.R. 490.) On October 15, 2019, Ms. Taveras met with Mr. Benitez, noted no changes in mood, thought processes, or functioning. (A.R. 478.) Mr. Benitez's primary concern during the session involved relationship stressors. *Id.* On November 8, 2019, Ms. Taveras again observed no significant changes in Mr. Benitez's mood and noted a reported increase in socialization and engagement in hobbies. (A.R. 476.) Mr. Benitez then had a follow up with Mr. Samson on November 11, 2019. (A.R. 532.) At the appointment, Mr. Benitez reported being less triggered or reactionary thanks to adherence to Lamictal. *Id.* However, Mr. Benitez also reported falling asleep "everywhere" regardless of how much sleep he had the night before. *Id.* Mr. Samson updated Mr. Benitez's diagnosis to bipolar disorder and recommended an increase in the dosage of Lamictal. (A.R. 533-534.)

At a follow up with Mr. Samson on January 6, 2020, Mr. Benitez noted that he was compliant with his use of Lamictal, which overall helped with mood stability. (A.R. 528*.*) However, Mr. Benitez still reported issues with emotional regulation, having a poor memory, and trouble staying awake, stating he was "falling asleep everywhere." *Id.* Mr. Samson noted that he believed Mr. Benitez's sleep and concentration issues were due to poor sleep and ongoing manic/hypomanic symptoms. *Id.* Mr. Samson also noted that Mr. Benitez's recreational drug use, including ecstasy and cocaine, could be contributing to Mr. Benitez's symptoms. *Id.* Mr. Samson noted no significant changes on Mr. Benitez's mental status exam, and recommended that Mr. Benitez add lithium to his medication regimen. (A.R. 531.) At a

follow up appointment on March 26, 2020, Mr. Benitez reported some improved sleep quality, but continued to report difficulty staying awake as well as irritability and agitation.  (A.R. 525.) No significant changes were noted on the mental status exam.  *Id.*

On March 31, 2020, Mr. Benitez returned for individual therapy with Ms. Taveras, where he reported mood and thought disturbances related to intimate relationships and a lack of interests or purpose.  (A.R. 574.)  Mr. Benitez denied other concerns and stated he was functioning adequately despite stressors including the relationship stressors and world events at the time.  (A.R. 474.)  On April 2, 2020, Mr. Benitez was seen by Mr. Samson, who diagnosed Mr. Benitez with ADHD, and recommended adding Vyvanse to his medications.  (A.R. 523.)  At this appointment, Mr. Benitez reported continued issues with concentration and staying awake during the day.  *Id.*  No changes were noted on the mental status exam.  (A.R. 521.)   On April 13, 2020, in a follow up with Mr. Samson, Mr. Benitez reported that his problems staying awake had improved with medication, and that he was less distractable.  (A.R. 517.)  Mr. Benitez also reported being unemployed due to the COVID-19 pandemic.  *Id.*  No changes were noted on the mental status exam.  *Id.* The next day on April 14, 2020, Mr. Benitez was seen by Ms. Taveras, and he reported moderate improvement in mood and thoughts since starting the additional medications.  (A.R. 472.)

On April 23, 2020, Mr. Benitez had a follow up appointment with Mr. Samson.  (A.R. 513.) Mr. Benitez reported that his sleep had gotten significantly better with medication and that he no longer felt tired during the day.  *Id.*  He continued to report memory issues, but also reported an increase in productivity.  *Id.* In an appointment with Ms. Taveras on May 19, 2020, Mr. Benitez reported stressors related to confined space and poor focus, coupled with a lack of

direction pertaining to employment. (A.R. 468.) Mr. Benitez reported he was managing/functioning adequately despite the ongoing circumstances of the pandemic. *Id.* In a follow up with Ms. Taveras on May 26, 2020, Mr. Benitez reported persistent daily challenges with overthinking, lack of energy or focus, and interpersonal relationship conflict. (A.R. 466.) The next day, May 27, 2020, Mr. Benitez met with Mr. Samson for psychotherapy via phone. (A.R. 509.) During the call, Mr. Benitez reported that he had run out of Lithium, and noticed that he was feeling sleepy again during the day since running out of the medication. *Id.* Mr. Samson noted that he advised Mr. Benitez to take his medications (both Lithium and Lamictal) at night, because taking them during the day (as Mr. Benitez reported) could cause drowsiness. *Id.* Mr. Samson noted no significant changes on a mental status exam. A.R. 510.

On June 2, 2020, Mr. Benitez met with Ms. Taveras, but only briefly and he reported he could not engage in a full session. (A.R. 464.) He stated that he felt "okay" and denied significant problems or concerns at the time. *Id.* At his next therapy visit with Mr. Taveras on June 9, 2020, Mr. Benitez discussed marital conflicts and denied other problems or concerns at the time. (A.R. 462.) He was seen again by Ms. Taveras for a routine therapy visit on June 16, 2020. (A.R. 460.) At the visit, Mr. Benitez reported "okay" mood and reflected on continued relationship stressors. *Id.* He also reported getting more work hours which "help[ed] him significantly with staying occupied/motivated." *Id.* Finally, he denied any new problems or concerns since the previous session and stated he was managing adequately overall. *Id.* On June 30, 2020, Mr. Benitez had a follow-up with N.P. Samson. (A.R. 505.) His mood was "stable" and he noted that medication was helping him stay awake during the day. *Id.* He also

reported continued issues with his memory, losing track of conversations, forgetfulness, and losing track of time. *Id.* No changes were noted on a mental status exam (A.R. 505-506.)

In his next therapy appointment with Ms. Taveras on July 21, 2020, Mr. Benitez reported that work was going well, and having recently enrolled in online classes for business management. (A.R. 458)  He also stated that he took a week-long road trip with his partner, which "significantly improved their relationship." *Id.*  On July 29, 2020, Mr. Benitez met with Mr. Samson for a follow up assessment. (A.R. 501)  He reported a stable mood and noted that medication was helpful during the daytime. *Id.*  Mr. Benitez continued to report ongoing memory issues, which he has experienced for most of his life. *Id.* No changes were noted on the mental status exam. *Id.*  On August 4, 2020, Mr. Benitez reported to Ms. Taveras that his moods "have been way better" since starting medication, though he continued to struggle with poor memory and retention issues, as well as poor focus. (A.R. 456)

On September 1, 2020, in a session with Ms. Taveras, Mr. Benitez again reported feeling "okay" overall, and was "surprised at how well he has adjusted to distance learning and been performing academically." (A.R. 454.)  In a September 3, 2020 follow up with Mr. Samson, Mr. Benitez reported stable mood, that he liked his medication regimen, and no changes were noted on the mental status exam. (A.R. 496)  On September 15, 2020, Mr. Benitez again reported that things were "going fine" to Ms. Taveras and that he was continuing to manage his studies and maintain his employment. (A.R. 452.) On October 27, 2020, Mr. Benitez was unable to participate in therapy with Ms. Taveras, but he reported that things were "fine" and suggested he reduce the frequency of his therapy to monthly sessions. (A.R. 450.)  In a December 8, 2020 appointment with Ms. Taveras, Mr. Benitez reported that he no longer had

specific treatment goals for therapy and request a pause in treatment, further stating

"everything is fine." (A.R. 620.)

On June 4, 2021, Mr. Benitez was evaluated by Jessica Clemons, M.D. after missing

several follow up appointments. (A.R. 586-589.) Mr. Benitez reported a short temper and

mood dysregulation. (A.R. 586.) No change was noted on his mental status exam. *Id.* Dr.

Clemons diagnosed bipolar disorder, ADHD, and memory loss, and refilled Plaintiff's

medications. (A.R. 588.) On July 1, 2020, Mr. Benitez had a follow up with Dr. Clemons. (A.R.

580.) Mr. Benitez reported that most days his mood is depressed, difficulty with sleep, and

constantly feeling "wired" but unable to concentrate on or finish tasks. *Id.* Dr. Clemons

diagnosed severe generalized anxiety disorder, social anxiety disorder, and mood disorder. (A.R.

584.) She prescribed Lexapro, Vyvanse, Lamictal, and Lithium. *Id.*

On October 6, 2021, Mr. Benitez was seen by Gayge Maggio, F.N.P.-B.C., reporting

worsening memory issues and not following up with behavioral health treatment. (A.R. 728.)

Mr. Benitez completed another PHQ, where he indicated over the last two weeks he had "not

at all" been bothered by little interest or pleasure in doing things, or by feeling down depressed

or hopeless. *Id.* A physical exam found normal memory and psychiatric orientation, with

appropriate mood, affect, insight, and judgment. *Id.* The same exam revealed anxiety. *Id.* On

October 13, 2021, Plaintiff returned to Dr. Clemons. (A.R. 930.) He reported a stable mood,

decreased anxiety, and feeling "much better" overall. *Id.* The psychiatrist prescribed Buspar,

Lexapro, and Vyvanse. (A.R. 932.) During a follow-up with Ms. Tavarez on October 19, 2021,

Mr. Benitez reported ongoing anxiety and depression with low drive, anger outbursts for

no reason, and suicidal thoughts (A.R. 874.)  A mental status exam yielded mostly normal or average results, except for a "depressed anxious" mood.  (A.R. 877.)  On October 26, 2021, Plaintiff had a therapy session Ms. Tavarez and discussed stressors and Mr. Benitez's belief that he has borderline personality disorder ("BPD.") (A.R. 872.)

On November 2, 2021, Mr. Benitez returned to Dr. Clemons reporting stability. (A.R. 925.)  Dr. Clemons noted unremarkable results on the mental status exam, including an "euthymic[1]" mood, and otherwise normal judgment, insight, and cognition. (A.R. 926-7.)  Dr. Clemons also noted that there was a "low suspicion" for bipolar disorder, given the pattern of Mr. Benitez's symptoms.  (A.R. 929.)  Dr. Clemons also noted that twenty minutes of the session were spent on "writing a SSD letter of support and coordination of care."  (A.R. 925.)  However, this letter is not included in the administrative record.  When seen for therapy on November 9, 2021, Mr. Benitez discussed a long history of difficulties sustaining relationships with others. (A.R. 868.)  He also reported that he had started to draw and paint again, noting that reengaging in his hobby has "significantly help[ed] him manage depressive episodes."  *Id.* Subsequent treatment notes document regular therapy through January 21, 2022 that focused on relationship stressors and included a discussion of an upcoming trip to Puerto Rico with his wife.  (A.R. 853-867.)  On February 3, 2022, Mr. Benitez told Ms. Tavarez he had difficulties with focus and procrastination, although a mental status exam revealed no abnormal findings and a continued "euthymic" mood. (A.R. 848.)  Additional notes document therapy visits through the end of the month, which mostly focused on his relationship with his spouse.  (A.R. 837-847.)

---

[1] A euthymic mood is defined as "a stable mental state or mood in those affected with bipolar disorder that is neither manic nor depressive." Euthymia. Merriam-Webster.com Medical Dictionary, Merriam-Webster, https://www.merriam-webster.com/medical/euthymia.  Accessed 10 May. 2024.

**B.  David Schaich, Psy.D. – SSA Consultative Examining Psychologist**

Dr. Schaich evaluated Mr. Benitez at the request of the Social Security Administration on October 14, 2020.  (A.R. 341.)  He drove himself to the appointment and was accompanied to the evaluation by his wife.  *Id.*  Mr. Benitez reported having been unemployed due to the COVID-19 pandemic.  *Id.*  He reported symptoms including excessive sleep, fluctuating appetite and weight, depression more days than not, crying spells, feelings of guilt, feelings of hopelessness, loss of interests, irritability, feelings of worthlessness, diminished sense of pleasure, social withdrawal, concentration problems, a history of suicidal thoughts, anxiety, excessive worry, apprehension, a history of trauma with physical abuse as a child, nightmares, flashbacks, intrusive thoughts, panic attacks, and mild cognitive deficits in the form of short term memory problems and frequent forgetting. (A.R. 341-342.)  Mental status examination revealed normal appearance, speech, thought processes, affect, orientation, attention and concentration. *Id.* The exam also revealed a "down" mood, below average cognitive functioning, "somewhat" limited fund of information, and only fair insight and judgment.  *Id.*

Dr. Schaich noted that Mr. Benitez could dress, bathe, and groom himself, prepare food, do laundry, clean, and shop.  (A.R. 343.)  He stated there was "no evidence of limitation in ability to understand, remember, or apply simple (or complex) directions and instructions.  *Id.* He noted a moderate limitation in ability to interact adequately with supervisors, co-workers, and the public. (A.R. 343-44.) He opined there was no evidence of limitation in ability to sustain concentration and perform a task at a consistent pace, or to sustain an ordinary routine and regular attendance at work.  *Id.*  He opined Mr. Benitez would have "moderate" limitations in the ability to regulate his emotions, control behavior, and maintain well-being.  *Id.* He

11

concluded the medical source statement with "results…. appear to be consistent with

psychiatric and substance abuse problems, but in itself this does not appear to be significant

enough to interfere with the claimant's ability to function on a daily basis." (A.R. 344.)   Dr.

Schaich diagnosed "unspecified" depressive disorder, "unspecified" anxiety disorder, panic

disorder, and mild cannabis use disorder.  *Id.*

### C. Non-Examining State Agency Medical Consultant

Psychologist K. Lieber-Diaz, Psy.D., reviewed the record on June 30, 2021 which included

treatment records only through October 2020.  (A.R. 87.) Based on these records, Dr. Lieber-

Diaz opined Mr. Benitez had "moderate" limitations (1) interacting with others and (2)

concentrating, persisting, or maintaining pace.  (A.R. 86.)   Dr. Lieber-Diaz noted that when

considering the evidence in the record, Mr. Benitez's medically determinable impairments

(including depression, personality, and anxiety disorders) could have reasonably been expected

to produce the alleged symptoms, however his statements concerning the intensity persistence

and limited effects of these symptoms were not generally consistent with the evidence in the

record. (A.R. 88-89.)

Dr. Lieber-Diaz opined Mr. Benitez had had "mild" limitations in understanding,

remembering, or applying information and adapting or managing himself. *Id.* The psychologist

further opined that Mr. Benitez was "moderately limited" in his ability to (1) understand and

remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and

concentration for extended periods; (4) perform activities within a schedule, maintain regular

attendance, and be punctual within customary tolerances; (5) work in coordination with or

proximity to others without being distracted by them; (6) complete a normal workday and

workweek without interruptions from psychologically based symptoms and to perform at a

consistent pace without rest periods of unreasonable length or frequency; (7) interact

appropriately with the general public; (8) get along with co-workers or peers without distracting

them or exhibiting behavioral extremes; and (9) maintain socially appropriate behavior and

adhere to basic standards of neatness or cleanliness. (A.R. 90-92.)  The psychologist merely

placed an "x" in the portions of the report requesting a narrative form for the limitations found.

*Id.*

### D.  Relevant Portion of Mr. Benitez's Testimony

On February 7, 2022, Mr. Benitez appeared before Administrative Law Judge ("ALJ")

Angela Banks. (A.R. 28.)  He appeared in person and was represented by an attorney. *Id.*   The

hearing began by discussing Mr. Benitez's work history, given there were periods he was

engaged in substantial gainful activity ("SGA") between his alleged onset date and the date of

the hearing.  (A.R. 31.)  When asked about his work for DFB Upholstery as a warehouse

associate from April 2021 to June 2021, Mr. Benitez stated that he stopped working because his

depression often causes him to have an inability to leave his home, and that he was fired as a

result.  (A.R. 32)  He stated that he was absent several time a week. (A.R. 33.)  When asked

about his work at Baldor Professional Services in 2020, he stated that he stopped working after

a month or two due to an altercation between himself and another employee.  *Id.*  He was next

asked about his work at A&J Staffing, which was a home care arrangement wherein he cared

for his wife's grandmother.  (A.R. 34)  Mr. Benitez also discussed his work for Capsule, a

pharmacy-delivery company, where he worked concurrently while serving as a caretaker to his

wife's grandmother in 2019. (A.R. 35.)  Mr. Benitez reported that he was fired from Capsule because his persistent fatigue prevented him from making timely deliveries.  (A.R. 35-36.)

After discussing Mr. Benitez's employment history after his alleged onset date ("AOD"), the questioning moved to his work from before the AOD.  Mr. Benitez reported working as a cashier or food preparer at companies including Burlington Coat Factory, Dunkin Donuts, Chipotle, Pret A Manager, and Chopped.  (A.R. 39-40.)   Mr. Benitez also reported working for a dog daycare for four months in 2018.  (A.R. 40.)  Counsel for Mr. Benitez noted that there were some missing up-to-date records from Callen-Lorde, and the ALJ reminded counsel he had 14 days to supplement the record.  (A.R. 45.)

The questioning then turned to Mr. Benitez's symptoms.  (A.R. 45.)  Mr. Benitez named anxiety and depression, uncertain moods, and getting distracted easily.  *Id.*  He stated that this makes it difficult to maintain a work schedule.  *Id.*  He also noted that he sleeps and isolates frequently, that on most days his goal is to get out of his house, but that he usually did not make it out.  (A.R. 45.)  Mr. Benitez reported rage and anxiety attacks.  (A.R. 45-46.)  He stated he experienced anxiety attacks a few times a week, and that they could make it difficult to breathe.  *Id.*  When asked if medications made a difference in his symptoms, Mr. Benitez reported that they do "sometimes, but not always." (A.R. 47.)  In particular he noted that they were helpful for his manic periods, and for his anxiety, but that they did not stop any attacks and don't help with his memory.  (A.R. 55.)  The ALJ asked if Mr. Benitez had ever been in a physical altercation with a stranger, and Mr. Benitez testified that he had, and that the police had been called.  (A.R. 48.)  He also reported that it had been "a while" since any physical altercation had occurred.  *Id.*  In part, Mr. Benitez attributed this to his avoiding large crowds,

which are a trigger.  *Id.* However, he noted that there had been a verbal altercation much more recently, days before the hearing. *Id.*

The ALJ then turned to Mr. Benitez's home life.  (A.R. 50.)  Mr. Benitez noted that he lives with his wife and their two children.  *Id.*  Mr. Benitez said his wife was primarily responsible for childcare, though he helps around the house.  *Id.*  Mr. Benitez then discussed his memory issues.  (A.R. 53.)  He attributed his frequent missing of medication management appointments to this forgetfulness, as well as depression causing him to lose interest in "taking care of himself."  (A.R. 55.)

### E. Relevant Portion of Vocational Expert's Testimony

The ALJ then posed various hypotheticals to a vocational expert ("VE") to determine whether Mr. Benitez could perform any of his past work or other work that exists in substantial numbers in the national economy.  First, the ALJ asked whether an individual of Mr. Benitez's age, education, and work history who was limited to simple and repetitive tasks; work in a low-stress job, defined as occasional decision-making, occasional judgment required, and occasional changes in the work setting; limited to work that is goal oriented but no production rate work such as an assembly line; and no more than occasional contact with co-workers, supervisors, and the public, could perform Plaintiff's past work as a warehouse worker and a kennel attendant. (A.R. 58-59.) The VE testified that Mr. Benitez could perform his previous roles as a warehouse worker or as a kennel attendant.  *Id.*  In addition, the VE testified that such a person could perform other work such as a shelving clerk, a cleaner, a mail clerk, and a dishwasher. (A.R. 59-60.)

The ALJ then posed a second hypothetical, with all the previous limitations but with the addition that the individual would be expected to be off task more than 20% of the time in an eight-hour workday.  (A.R. 60.)   The VE testified that if an individual was also off task 20% of the day, he could not perform any of the Plaintiff's past work or any competitive employment. *Id.*  The VE also testified that one absence a month may be tolerated in each of these roles. (A.R. 61.)  Finally, the VE stated that while some roles as a cleaner could satisfy a requirement of only occasional contact with supervisors and no contact with coworkers or the public, he could not determine how that would impact the number of such jobs in the national economy. *Id.*

### 2. The ALJ's Decision

In a decision dated May 3, 2022, ALJ Banks determined that Mr. Benitez had not been under a disability as defined in the Social Security Act from the AOD through the date of the decision.  The ALJ began her decision by noting that Mr. Benitez met the insured status requirement through September 30, 2025.  (A.R. 13.)  Next, the ALJ determined that Mr. Benitez was engaged in SGA from January 1, 2018, through January 31, 2020.  (A.R. 14)  The ALJ then assessed Mr. Benitez's claims for the period that he was not engaged in SGA, including from the AOD through 2019, and from February 2020 through the date of the decision.  *Id.*  The ALJ next determined that Mr. Benitez had the severe impairments of bipolar disorder, anxiety, and ADHD which significantly limit his ability to perform basic work activities.  (A.R. 14.) However, the ALJ also determined that Mr. Benitez did not have a combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 4040, Subpart P, Appendix 1.  (A.R. 15.)

The ALJ noted Mr. Benitez has a "moderate" limitation in understanding, remembering or applying information, but that he had these impairments most of his life including when he previously worked at SGA levels. *Id.* The ALJ also found a moderate limitation in interacting with others, but noted that Mr. Benitez's social skills and relatability on examination were fair. *Id.* Similarly, the ALJ found Mr. Benitez had a moderate limitation in concentrating, persisting, or maintaining pace. *Id.* The ALJ noted the reports of poor memory and focus, as well as consistent findings of normal condition and thought processes on mental status exams. (A.R. 15-16.) Finally, when evaluating Mr. Benitez's ability to adapt or manage himself, the ALJ found a moderate limitation, noting that Mr. Benitez can take public transit, prepare meals, clean, do laundry, and has apparently intact judgment. (A.R. 16.) The ALJ concluded that because Mr. Benitez's mental impairments do no cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria were not satisfied. *Id.*

The ALJ then concluded that Mr. Benitez had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following non-exertional limitations: can perform simple and repetitive tasks; can perform work in a low-stress job, defined as occasional decision making, occasional judgment required, and occasional changes in the work setting; can perform work that is goal oriented, but no production-rate pace work; can tolerate occasional contact with coworkers, supervisors, and the public. *Id.* The ALJ stated that Mr. Benitez's statements about the intensity, persistence, and limiting effects of his symptoms were inconsistent with the medical and other evidence. (A.R. 17.) This included several reports that Mr. Benitez had a stable mood during appointments, that his conditions improved with

medication including Vyvanse, that he engaged in international travel, and that he had engaged in work at SGA levels despite some of the claimed impairments.  *Id.*

When evaluating the medical opinions and prior administrative medical findings the ALJ declined to defer or give any specific evidentiary weight to any of the prior opinions.  (A.R. 18.) The ALJ determined the Disability Determination Services ("DDS") reconsideration that Mr. Benitez had moderate limitations in interacting with others and in concentration were persuasive, and supported by specific medical evidence.  (A.R. 18.)  She determined that the purported mild restrictions in understanding or remembering information were not persuasive, given medical evidence that Mr. Benitez had limited socialization skills, and documented memory deficits with episodes of mood instability.  *Id.* The ALJ also determined that the restriction to unskilled work with limited contact with others was unpersuasive because it did not identify work-related limitations in specific functional areas.  *Id.*

The ALJ determined that the initial DDS finding of non-severe mental impairments was unpersuasive, given Mr. Benitez's inability to perform serial 7s, limited "fund of knowledge," coupled with his diagnoses of anxiety and depression.  *Id.*   The ALJ also noted that his medication management and 2021 evaluation were not consistent with a finding of non-severe impairments. *Id.*  Finally, the ALJ determined the opinion of Dr. Schaich was unpersuasive insofar as it suggested Mr. Benitez had no limitations with respect to concentration, and "moderate" limitations in interacting with others and in regulating emotions. *Id.* The ALJ noted this opinion was not supported by Mr. Benitez's performance on cognitive exams, and inconsistent with the Plaintiff's self-reported symptoms of forgetfulness and difficulty

concentrating.  *Id.* Finally, the ALJ noted that the term "moderate limitation" was not defined to include any specific work-related limitations. *Id.*

The ALJ then determined that Mr. Benitez could perform some of his past relevant work, including as a warehouse worker and kennel attendant, as well as other jobs that exist in significant numbers in the national economy such as a dishwasher or shelving clerk.  A.R. 20. Accordingly, the ALJ concluded that Plaintiff was not disabled and denied Plaintiff's claims. (A.R. 35.)

## **LEGAL STANDARDS**

A court reviewing a final decision by the Commissioner must, as a threshold matter, determine whether the ALJ provided the plaintiff with a full and fair hearing under the Secretary's regulations and fully and completely developed the administrative record.  *Intonato v. Colvin*, 2014 WL 3893288, at *8 (S.D.N.Y. Aug. 7, 2014) (citation omitted).  The duty to develop the record requires the ALJ "to ensure that the record contains sufficient evidence to make a determination."  *Bussi v. Barnhart*, 2003 WL 21283448, at *8 (S.D.N.Y. June 3, 2003). Once the court is satisfied that the plaintiff was afforded a full hearing and the record is fully developed, the court then assesses the Commissioner's conclusions.  In doing so, the court is limited to determining whether the Commissioner's conclusions (1) "were supported by substantial evidence in the record" and (2) "were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (citation omitted).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402

U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  To be supported by substantial evidence, the ALJ's decision must be based on "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B).  The ALJ's decision must set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based." Id. § 405(b)(1).  It must do so "with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Herrera v. Comm'r of Soc. Sec.*, 2021 WL 4909955, at *5 (S.D.N.Y. Oct. 21, 2021) (citation omitted).

That said, the ALJ need not "mention[ ] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010). If the ALJ fails to consider evidence in the record, the Court must be "able to look to other portions of the ALJ's decision and to clearly credible evidence" to find that the determination was supported by substantial evidence. *Mongeur*, 722 F.2d at 1040 (citation omitted).  If the Commissioner's findings are supported by substantial evidence, those findings are conclusive.  42 U.S.C. § 405(g); see also *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

As to the correct legal standard, the Commissioner is required to conduct a sequential five-step inquiry to determine: (1) whether the claimant is currently engaged in any substantial gainful activity; (2) if not, whether the claimant has a "severe impairment" that limits their ability to do basic work activities; (3) if so, whether the impairment is listed in Appendix 1 of the regulations, and what the claimant's RFC is; (4) if the impairment does not qualify as a listed impairment, whether the claimant possesses the RFC to perform their past work; and (5) if the claimant is not capable of performing past work, whether they are capable of performing other

work that exists in the national economy. *Vellone v. Saul*, 2021 WL 319354, at *5 (S.D.N.Y. Jan. 29, 2021), report and recommendation adopted sub nom. *Vellone* on behalf of Vellone v. Saul, 2021 WL 2801138 (S.D.N.Y. July 6, 2021). The claimant bears the burden of proof at the first four steps of the analysis, and at the last step, the Commissioner has the burden to show there is other work the claimant can perform. *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998).

When considering the medical opinions, the Commissioner must consider five factors: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) other factors. 20 C.F.R. §§ 404.1520c(c), 416.920c(c).  The supportability and consistency factors are the "most important," and ALJs must explain how they considered those factors for medical opinions. Id. §§ 416.920a, 416.920c(b)(2).  The supportability inquiry focuses on how well a medical source supported and explained their opinion. *Vellone*, 2021 WL 319354, at *6. The question of consistency concerns whether the opinion is consistent with other evidence in the medical record. *Id.* The Commissioner is tasked with analyzing medical opinions at the source-level, meaning the Commissioner need not discuss each medical opinion in the record, and may apply the five factors holistically to a single medical source.  20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1).

Regarding claims filed on or after March 27, 2017, in evaluating the medical evidence, the Commissioner need not assign evidentiary weight to treating physicians as was previously required by the Act. *Vellone*, 2021 WL 319354, at *6.  However, the regulations continue to recognize the "foundational nature" of the observations of treating sources. *Steven M.W. v. Comm'r of Soc. Sec.*, 2022 WL 2669491, at *6 (S.D.N.Y. June 17, 2022), *report and*

*recommendation adopted sub nom.*, *Washburn v. Comm'r of Soc. Sec.*, 2022 WL 2669296 (S.D.N.Y. July 11, 2022).

An ALJ's evaluation as to the claimant's subjective statements about their symptoms and resulting limitations is entitled to deference by a reviewing court.  *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006).  Therefore, "[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." *Id.*  SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)).  Instead, the ALJ must follow a two-step framework for evaluating allegations of pain and other limitations.  *Id.*

First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged.  *Id.* (citing 20 C.F.R. § 404.1529(b)).  "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (citing 20 C.F.R. § 404.1529(a)).  To make that determination, the ALJ must consider (in addition to objective medical evidence):  1. The individual's daily activities; 2. [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. [f]actors that precipitate and aggravate the symptoms; 4. [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. [a]ny measures other than treatment the individual uses or has used to

relieve pain or other symptoms; and 7. [a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).

<u>**DISCUSSION**</u>

The Plaintiff argues that the ALJ erred by 1) failing to fully develop the administrative record by not obtaining a "letter of support" from Dr. Clemons and by not seeking clarification on medical opinions she determined were "vague," 2) failing to evaluate the medical opinion evidence resulting in a faulty RFC determination, and 3) failing to properly evaluate Mr. Benitez's subjective statements.  The Court addresses each argument below in turn.

**A.  The ALJ's Development of the Administrative Record**

The parties do not dispute whether the ALJ provided Plaintiff with a full and fair hearing under the Secretary's regulation.  However, the Plaintiff does argue that the ALJ erred by not obtaining the "letter of support" Dr. Clemons references writing in her treatment notes from November 21, 2021.  (A.R. 925; ECF No. 9 at 14.)  Further, Plaintiff argues that the ALJ should have obtained a more recent consultative examiner's opinion because the ALJ characterized the limitations in Dr. Schaich's opinion as vague.  ECF No. at 15.  Both arguments are unavailing and misstate the ALJ's obligations where the medical record is otherwise comprehensive and lacks meaningful contradictions.

As an initial matter, it is the Plaintiff's burden to provide evidence establishing disability, and the Commissioner's regulations require the Plaintiff to develop the record.  20 C.F.R. § 404.1512.  A "complete" record is not one that contains every single medical opinion, but one

that is enough "to allow [the Social Security Administration] to make a determination or decision about whether you are disabled." 20 C.F.R. § 416.912(a)(2). Plaintiff has not provided the letter from Dr. Clemons to this Court, as he was allowed to under 42 U.S.C. 405(g) if it constituted new and material evidence.  The ALJ offered Plaintiff (who was represented by counsel) additional time to supplement the record with the letter from Dr. Clemens or more recent medical records. *See* A.R. 45 (ALJ granting two-week extension to submit up-to-date records from Callen Lorde).  Even without this letter, the ALJ had years of treatment notes provided by Callen-Lorde, including from three sessions with Dr. Clemons, to provide enough evidence for the ALJ to make a determination of disability. *See Rosa v. Callahan*, 168 F.3d 72, 79 n.5. (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.")  In fact, the two more recent treatment notes from Dr. Clemons included "unremarkable" results on mental status exams, stable mood, and reports from the Plaintiff that he was feeling "much better." (A.R. 932; 925-7.)  The most recent record from Dr. Clemons actually disputes Plaintiff's diagnosis of bipolar disorder given Plaintiff's pattern of symptoms. (A.R. 929.)

While Plaintiff similarly argues that the most recent notes from Callen-Lorde were not included in the record before the ALJ, Plaintiff does not argue (and this Court's review of the records does not indicate) that these more recent records demonstrate that Mr. Benitez's condition further deteriorated.  *See* A.R. 728 (October 6, 2021 PHQ showing no recent issues with little interest or pleasure in doing things, exam revealing unremarkable results but anxiety); (A.R. 930)(October 13, 2021 exam notes reporting stable mood, decreased anxiety);

(A.R. 874)(October 19, 2021 notes where Plaintiff reported anxiety and depression, but normal or average results on mental status exam except depressed/anxious mood); (A.R. 952)(November 2, 2021 notes wherein Plaintiff reported stability, noting euthymic mood and normal judgment); (A.R. 853-867)(therapy notes through January 2022 focusing on relationship stressors and upcoming travel to Puerto Rico.); (A.R. 848)(February 3, 2022 notes reflecting difficulties with focus, but euthymic mood and no abnormal findings on mental status exam.) Similarly, Plaintiff offers no evidence that Mr. Benitez's condition deteriorated after the opinion from Dr. Lieber-Diaz which would render that opinion stale.  Without evidence that more recent records would have contradicted the evidence in the record, there is no basis for finding that the record before the ALJ was incomplete.  *See Villalobo v. Saul*, 2021 WL 830034, at *19 (S.D.N.Y. Feb. 9, 2021) ("Absent any significant developments in Plaintiff's medical history indicating worsening conditions, Plaintiff has not shown that the opinions of record are stale warranting further factual development.")

Therefore, the Court concludes that the ALJ adequately developed a complete medical record in compliance with the Commissioner's regulations.

**B.  The ALJ's Evaluation of the Medical Opinion Evidence and RFC Determination**

Plaintiff's next argument is that the ALJ erred by failing to determine the persuasiveness of all the medical opinions by considering the factors specified by 20 C.F.R. § 404.1520c(c). Plaintiff contends that the ALJ "fails to provide any meaningful analysis of how" the opinions of one-time examining psychologist Dr. Schaich were unpersuasive, or how the opinions of Dr. Lieber-Diaz were "partially persuasive." Plaintiff's argument is unpersuasive.  Indeed, to the extent the ALJ rejected the medical opinions, the ALJ found Mr. Benitez's impairments were

more severe than these medical opinions suggested and tailored the RFC based on the record as a whole.

Dr. Schaich stated there was "no evidence of limitation in [Plaintiff's] ability to understand, remember, or apply simple (or complex) directions and instructions." (A.R. 343-44.) The ALJ determined this opinion was unpersuasive because it was unsupported by medical records that indicated Mr. Benitez could not perform serial 7s, and had a limited fund of knowledge. (A.R. 19.) The ALJ noted that this finding was also inconsistent with Mr. Benitez's frequently reported difficulties with concentrating. *Id.* The ALJ plainly addressed the two most important factors, supportability and consistency, in finding that Dr. Schaich's opinion was not persuasive, evaluating the actual findings of Dr. Schaich for supportability and its consistency with treatment notes from other sources. In fact, the ALJ found Mr. Benitez was more impaired in these areas than the medical opinion suggested. As for Dr. Schaich's findings of moderate limitations in ability to interact adequately with others and in Plaintiff's ability to regulate his emotions, the ALJ noted that Dr. Schaich did not define the term "moderate limitations." (A.R. 343-44; A.R. 19.) However, the ALJ's RFC determination nevertheless incorporated these limitations into the RFP by including non-exertional limitations of a "low stress job… without production-rate pace work, and with only occasional contact with supervisors, coworkers, and the public." (A.R. 16.) Substantial evidence supports the RFC and a finding that the Plaintiff had *intact* attention and concentration, fair-to-normal judgment, was cooperative, and had normal memory, reflects the ALJ's proper resolution of conflicting evidence in the record. (A.R. 342-43, 366, 384, 389-90, 402, 406, 410, 413, 426, 431, 434, 443, 482, 484-85, 488, 747, 751, 771, 773, 779, 783, 791, 802, 820, 823, 832, 919-22, 926-27, 986.)

When evaluating the report of Dr. Lieber-Diaz, the ALJ also considered supportability and consistency when determining the opinions were "partially persuasive." (A.R. 18-19.) First the ALJ determined that Dr. Lieber-Diaz's assessment that Plaintiff had moderate mental functional limitations was persuasive because it was supported by clinical findings including Mr. Benitez's ability to perform serial 3s, difficulty performing serial 7s, and evidence of poor family relationships. (A.R. 18.) The ALJ also noted this finding was consistent with other evidence in the record including Plaintiff's ability to travel, including to Puerto Rico, Mexico, and a multi-day road trip across the south. *Id.* The ALJ determined Dr. Lieber-Diaz's assessment of "mild" limitations in understanding, or remembering, was unpersuasive because it was inconsistent with Mr. Benitez's episodes of mood instability and reported memory deficits. (A.R. 18.) Here, as with the opinion of Dr. Schaich, to the extent the ALJ found the medical opinion unpersuasive, it is because the ALJ determined some assessed limitations understated Mr. Benitez's impairments. In other words, the ALJ found greater limitations when arriving at an RFC based on resolution of all of the evidence in the record. Notably, a finding that a Plaintiff has a moderate, or even marked, limitation in maintaining pace or regulating behavior, does not preclude a finding that Plaintiff can perform unskilled work. Courts have found moderate, and even marked limitations in maintaining pace or regulating behavior, or dealing with stress, or concentration/attention do not preclude an RFC that Plaintiff can do unskilled work. *See Del Carmen Fernandez v. Berryhill*, 2019 WL 667743, at *9 (S.D.N.Y. Feb. 19, 2019).

Plaintiff nevertheless argues that the ALJ's RFC determination failed to take in to account the "moderate" limitations in maintaining attention, concentration, and maintaining regular attendance, identified by Dr. Lieber-Diaz. ECF No. 14 at 4-5, citing *Rivera v. Comm'r of*

*Soc. Sec.*, No. 21-CV-1193 (CS) (JCM), 2022 WL 4482374 (S.D.N.Y. Sept. 27, 2022).  This

argument misstates both the law and the record.  First, the ALJ's RFC determination explicitly

includes limitations addressing the "moderate" impairments including no production-rate pace

work, requiring simple and repetitive tasks, and a low-stress job that is goal oriented.  A.R. 16.

Moderate limitations in concentration or maintaining regular attendance do not mandate a

finding of disability.  *See Duffy v. Comm'r of Soc. Sec.*, No. 17CV3560GHWRWL, 2018 WL

4376414, at *18 (S.D.N.Y. Aug. 24, 2018), *report and recommendation adopted*, No. 1:17-CV-

3560-GHW, 2018 WL 4373997 (S.D.N.Y. Sept. 13, 2018)(evaluating an RFC determination based

in part on Dr. Lieber-Diaz opining that Plaintiff had moderate limitations in understanding and

following instructions)(collecting cases holding that a limitation to unskilled work can account

for limitations in concentration and pace.)  Further, none of the medical opinions in the record

stated that Mr. Benitez would necessarily be off task for 20% of the day, or that he would have

to miss more than one day of work per month.  This distinguishes Mr. Benitez's case from

*Rivera v. Comm'r of Soc. Sec.*, where at least four medical sources opined the Plaintiff had

moderate *to marked* limitations in maintaining attendance, and one source explicitly stated the

Plaintiff would miss at least three days of work per month.  2022 WL 4482374 at *3.

      Given the ALJ's evaluation of each medical opinion for consistency and supportability

with the entire record, the Plaintiff's arguments that the ALJ engaged in "cherry-picking" is

unavailing.   While Plaintiff claims "the ALJ… disregard[ed] the evidence that is consistent with

the opinions from the treating doctors," Plaintiff actually disputes the ALJ's use of evidence

*from the treating physicians* to determine the opinions of Dr. Schaich and Dr. Lieber-Diaz

*understated* the Plaintiff's impairments. Cherry-picking is defined as "inappropriately crediting

evidence that supports administrative conclusions while disregarding differing evidence from the same source." *Artinian v. Berryhill*, No. 16-cv-4404 (ADS), 2018 WL 401186, at *8 (E.D.N.Y. Jan. 12, 2018).  Consideration of all the medical evidence, particularly to determine the Plaintiff is more impaired than the consultive examiner or the non-examining state agency medical consultant opined, is the opposite of cherry-picking the evidence.  For this reason, as Defendant notes, an allegation of cherry-picking is "seldom successful because crediting it would require a court to re-weigh record evidence."  *Lisa T. v. Kijakazi*, No. 3:20-CV-1764 (SVN), 2022 WL 2207613, at *3 (D. Conn. June 21, 2022)(citations omitted).  Therefore, the Court finds that the ALJ did not engage in cherry-picking when arriving at the RFC.

In short, the ALJ evaluated every medical opinion provided by a physician for its supportability and consistency with the objective medical evidence and the record as a whole. While Plaintiff has suggests there was evidence to find the physicians' opinions of more extreme limitations were persuasive, "whether there is substantial evidence supporting the [plaintiff's] view is not the question here; rather, [the Court] must decide whether substantial evidence supports the ALJ's decision." *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013).  Plaintiff's disagreement with the ALJ's assessment of the evidence is not a basis for remand.  *See Wilson o/b/o J.J.W. v. Comm'r of Soc. Sec.*, No. 1:19-CV-737-DB, 2020 WL 3447800, at *5 (W.D.N.Y. June 24, 2020) ([M]ere disagreement with the ALJ's findings does not warrant remand.")  Instead, the Court must defer to the ALJ where, as here, each of the opinions was properly considered under the required factors, and substantial evidence – that is sufficient evidence "as a reasonable mind might accept as adequate to support a conclusion" —

supports the ALJ's evaluation.  Accordingly, the Court finds no reversible error in the evaluation of the medical opinion evidence or the ALJ's RFC determination.

### C. <u>The ALJ's Evaluation of Mr. Benitez's Subjective Statements</u>

Plaintiff also argues that the ALJ's determination that Mr. Benitez's  "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms" but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record," was not supported by substantial evidence.  (A.R. 18.)  Specifically, the Plaintiff stated the ALJ overstated Mr. Benitez's improvement with treatment/medication, which occurred "while Plaintiff was not exposed to any stress associated with the demands of work." ECF No. 9 at 18.  Plaintiff also alleges that all "slight" improvements were followed by exacerbation of symptoms.  Finally, Plaintiff states that the ALJ gave too much weight to Mr. Benitez's ability to engage in some activities of daily living.  Here, Plaintiff misstates the record, and the arguments are unavailing.

First, the ALJ properly considered treatment notes that showed that Plaintiff's concentration, anger issues, and tiredness improved with medication.  (A.R. 17, 501, 513, 517, 616, 961.)  Despite Plaintiff's contention that these improvements never took place in the context of work, that is plainly inaccurate, and several treatment notes indicate that work had a *beneficial* impact on Mr. Benitez's wellbeing. *See e.g.,* (A.R. 513) (April 23, 2020, treatment notes where Plaintiff reported medication caused increase in productivity at work); (A.R. 460) (June 16, 2020 treatment notes where Mr. Benitez reported "okay" mood also reported getting

more work hours which "help[ed] him significantly with staying occupied/motivated.")  Further, despite Mr. Benitez's longstanding memory issues, those did not preclude him from working at SGA levels for significant periods after the AOD.  (A.R. 17, 39-41, 234.)

Similarly, Plaintiff alleges that all improvements were followed by "exacerbated" symptoms, but that is inconsistent with the record as well.  In his opening Brief, Plaintiff argues that after April 28, 2020, "Mr. Benitez's condition deteriorated." ECF No. 9 at 5.  However, on June 16, 2020,  Mr. Benitez reported that work helped him with staying occupied and motivated.  (A.R. 460.)  On June 30, 2020, Mr. Benitez presented with a "stable" mood and noted that medication was helping him stay awake during the day and no changes were noted on a mental status exam.  (A.R. 505-506.)  On July 21, 2020, Mr. Benitez reported that work was doing well, and he enrolled in online classes for business management.  (A.R. 458.) That was also when he took a weeklong road trip with his partner, which "significantly improved their relationship." *Id.*  On July 29, 2020, he reported a stable mood, and noted that medication was helpful during the daytime.  (A.R. 501.)  On August 4, 2020, Mr. Benitez reported that his moods "have been way better" with medication.  (A.R. 456)  On September 1, 2020, he again reported feeling "okay" overall, and was "surprised at how well he has adjusted to distance learning and been performing academically."  (A.R. 454.)  In a September 3, 2020 he reported stable mood, that he liked his medication regimen, and no changes were noted on the mental status exam.  (A.R. 496).  On September 15, 2020, he again reported that things were "going fine" and that he was continuing to manage his studies and maintain his employment.  (A.R. 452.)  By December 8, 2020, Mr. Benitez reported that he no longer had specific treatment goals for therapy and requested a pause in treatment, further stating "everything is fine."  (A.R. 620.) It is

only after Mr. Benitez ceased treatment that there was a noted decline in his wellbeing – and he sought assistance with medication management again. (A.R. 586-589.)  After several months returning to treatment, therapy notes consistently found a euthymic mood and sessions focused on relationship stressors.   (A.R. 837-847.)

In short, the ALJ's evaluation of Mr. Benitez's subjective statements was supported by substantial evidence including the treatment notes provided by Plaintiff.  The ALJ's determination was further supported by evidence of Plaintiff's ability to engage in the activities of daily life – including numerous trips both domestically and abroad, enrollment in classes, and occasional part time work. *Dritan Q. v. Comm'r of Soc. Sec.*, No. 1:23-CV-00997-GRJ, 2023 WL 7131858, at *5 (S.D.N.Y. Oct. 30, 2023)( activities of daily living, including use of public transportation, paying bills, attending to finances, shopping, socialization, attending school events for his children, and international travel, [are] inconsistent with [] marked limitations.)

Therefore, the Court determines that the ALJ's evaluation of Mr. Benitez's subjective statements was supported by substantial evidence, and there is no reversible error.

**CONCLUSION**

For the reasons stated above, Plaintiff's motion for judgement on the pleadings is

DENIED and Defendant's final decision that the Plaintiff was not disabled through the date of

the ALJ's decision is AFFIRMED.

**SO ORDERED.**


DATED:        New York, New York

                   May 15, 2024

                                                            _____

                                                            KATHARINE H. PARKER

                                                            United States Magistrate Judge